# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Mandarino*, 2013 IL App (1st) 111772

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMES MANDARINO, Defendant-Appellant. |
| District & No. | First District, Third Division<br>Docket No. 1-11-1772 |
| Filed | June 28, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In a prosecution for the beating inflicted by defendant in the course of a traffic stop he made while employed as a police officer, defendant's convictions for aggravated battery and official misconduct were upheld over his arguments that the deputy chief's opinion of defendant's use of force was improperly admitted and that the wrong standard was applied in assessing his use of force, since defendant failed to object to the testimony of the deputy chief, a rational trier of fact could have concluded that the force used by defendant was not legally justified, the trial court properly applied the reasonableness standard in concluding that the conduct was unnecessary and unprovoked, and the evidence supported the findings that great bodily harm was inflicted and that defendant used his baton as a deadly weapon. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-CR-08675; the Hon. Thomas Fecarotta, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Erin McCurdy Levy, of Clarendon Hills, for appellant. |
| | |
| | Anita M. Alvarez, State's Attorney, of Chicago (Janet C. Mahoney, Assistant State's Attorney, of counsel), for the People. |
| | |
| Panel | JUSTICE HYMAN delivered the judgment of the court, with opinion. Presiding Justice Neville concurred in the judgment and opinion. Justice Sterba dissented, with opinion. |

**OPINION**

¶ 1    After a firearm, the law enforcement officer's most potentially damaging weapon is the baton. When self-defense is at play, or circumstances call for coercive or precautionary measures, the baton offers a less harmful yet effective alternative. Nevertheless, like with a firearm, use of the baton is fraught with risk and repercussions.

¶ 2    Defendant James Mandarino, a former police officer in Streamwood, Illinois, was convicted after a bench trial of aggravated battery and official misconduct stemming from an early morning traffic stop that ended with Mandarino striking the nonaggressive driver 15 times in the span of 10 seconds with his baton. Mandarino raises five issues on appeal–whether the trial court erred in (i) allowing a lay witness's opinion testimony on use of force; (ii) stating that Mandarino may not have known that his squad car camera was recording; (iii) denying Mandarino's motion to reopen proofs; and (iv) applying the incorrect standard for assessing Mandarino's use of force. Finally, Mandarino contends the State failed to prove his guilt beyond a reasonable doubt. After a thorough review of the record, we affirm the trial court.

¶ 3                                    BACKGROUND

¶ 4    In 1993, Mandarino became a police officer and joined the Streamwood police department as a patrol officer the next year. Promoted to the tactical unit in 1997, Mandarino also took on the additional duties of field training officer. In 2001, he returned to patrol duties, working the midnight shift. He received the Chief's Award in 2005 for his work training other officers, and in 2006, was selected to serve as a sharpshooter for the Northern Illinois Police Alarm System, a SWAT team specializing in high risk situations. His stellar career, however, would end following the events on the early morning of March 28, 2010.

¶ 5    Ronald Bell and his friend, Nolan Stalbaum, attended a union banquet on Saturday evening, March 27. Bell testified that before dinner he had two mixed drinks and another after dinner. Stalbaum had four drinks. From the banquet, Bell and Stalbaum went to Bell's cousin's house to watch a pay-per-view fight. They arrived close to 1:30 a.m. Bell testified

that he did not drink any liquor while there. At about 3 a.m., with Bell at the wheel, Bell and Stalbaum headed to Bell's home in Streamwood, where he lives with his brother and his brother's family.

¶ 6 That Saturday, Mandarino's shift started at 6 p.m., and was scheduled to end at 6 a.m. On March 28, around 3:45 a.m., with the temperature hovering near 30 degrees, a light spring rain tapping against his windshield, Mandarino observed the traffic along Schaumburg Road from a strategic spot in front of a strip mall. What happened next was captured on video (no audio was recorded) by a dashboard camera in Mandarino's squad car. (Note: The "Time Stamp" on the video reads one hour earlier than the actual time of the events. The "Description" occurred extremely close in proximity to, but not necessarily at, the exact time indicated below.)

| Time Stamp | Description |
| --- | --- |
| 02:47:17.5 | Mandarino sits in his squad car in front of a strip mall on Schaumburg Rd., Streamwood, Illinois. |
| 02:48:30.1 | Bell's car, heading westbound along Schaumburg Rd., comes into view. |
| 02:48:41.7 | As Bell turns off Schaumburg Rd. onto East Ave., Mandarino testifies that Bell accelerated, causing his tires to squeal. |
| 02:48:45.6 | The squad car starts moving. Mandarino calls dispatch to report a vehicle driving recklessly. |
| 02:48:51.7 | Mandarino pursues Bell's car. |
| 02:48:55.3 | Bell's car turns from East Ave. left onto Juniper Circle.<br><br>Mandarino testifies that Bell took the turn sharply, nearly hitting the curb, which Bell denies. |

| 02:49:05.9 | Mandarino activates the emergency lights while turning onto Juniper Circle. |
|---|---|
| 02:49.08.7 | Bell's brake lights activate as he turns left into the driveway of 228 Juniper Circle. |
| 02:49:16.4 | Mandarino pulls into the driveway. |
| 02:49:21.6 | Bell's car sits between a two-story townhome on the right side of the screen and a parked car to the left side. |
| 02:49:24.4 | Mandarino parks his squad car about two car lengths behind Bell's car. Bell's brake lights go off.<br><br>Both Bell and Stalbaum testify that neither was aware that they had been followed by Mandarino until about this moment.<br><br>Mandarino reports to dispatch a reckless driving stop. |
| 02:49:26.0 | Mandarino leaves his squad car.<br><br>Bell opens the driver's door, and, two seconds later, Stalbaum opens the passenger door. |
| 02:49:28.9 | Bell slowly exits, looking back at the squad car.<br><br>Mandarino testifies that, as he approached, he said, "Streamwood police department, get back in the vehicle and close the door. Get back in the vehicle and close the door."<br><br>Stalbaum testifies that he did not hear Mandarino say this and that Mandarino never ordered them to get back in the car. |

| | |
|---|---|
| 02:49:29.4  | Mandarino walks toward the car, his right hand on his holster. Bell is partially out of the car, with one foot on the ground. Stalbaum remains inside the car with the door open.<br><br>Mandarino testifies that, in an attempt to contain them, he told Bell and Stalbaum four times to remain in the car, and their getting out of the car created a high risk situation. |
| 02:49:30.2  | Mandarino, still walking forward, draws his gun and aims at Bell, who is standing with one foot outside his car and one foot inside.<br><br>Mandarino testifies that he drew his gun because of two recent armed robberies reported within a mile of the location, and because Bell and Stalbaum were not getting back in the car. Mandarino says he ordered Bell and Stalbaum to "put your hands where I can see them and get back in the vehicle."<br><br>(Deputy Police Chief James Keegan testifies that Juniper Circle was a low crime area without gang activity.) |
| 02:49:32.0  | Mandarino stops several feet behind Bell's car. Bell retreats inside the car. Stalbaum stands outside the car, looking at Mandarino. Stalbaum holds a cup or can in his right hand.<br><br>Mandarino testifies that he thought Stalbaum was holding a can.<br><br>Stalbaum says, "You have no right to stop me. I'm not the driver." |

| | |
|---|---|
| 02:49:33.7 | Mandarino aims his gun at Stalbaum, who closes the passenger door. Bell sits in the car with one foot on the ground, looking back at Mandarino.<br><br>Mandarino orders Stalbaum to get in the car and close the door. |
| 02:49:36.8 | Mandarino begins walking to the right, still pointing his gun at Stalbaum. Mandarino tells Stalbaum to get back in the car. |
| 02:49:38.6 | After taking three steps, Mandarino stops.<br><br>Stalbaum testifies that Mandarino told him to "remain by the vehicle." |
| 02:49:40.7 | Stalbaum turns around and takes a step back toward the car.<br><br>Mandarino testifies that Stalbaum yelled, "This is f***ing bullsh***! What's your problem? You have no f***ing right to stop me. I'm not the driver." Mandarino describes Stalbaum as "agitated." |
| 02:49:51.2 | Stalbaum opens the passenger door, but remains standing. |
| 02:49:57.3 | Mandarino aims his gun at Bell, who is still sitting in the car with one foot on the ground. |

| 02:50:00.1 | Mandarino takes a step toward Bell, and Bell puts both hands on his head. |
|---|---|
| 02:50:02.9 | Bell removes his hands from his head. |
| 02:50:05.8 | Bell puts his hands back on his head.<br><br>Mandarino testifies that he never instructed Bell to put his hands on his head. |
| 02:50:07.6 | Bell removes his hands from his head, but keeps them up. He turns his head to talk to Mandarino. Bell testifies that he told Mandarino, " You have no right to stop me. I'm on my driveway. What's your problem? This is ridiculous."<br><br>According to Mandarino, Mandarino responds that he stopped Bell "for squealing tires, improper lane usage, and driving recklessly," and orders him to get back in the car and close the door. |
| 02:50:11.2 | Bell again puts his hands on his head. |
| 02:50:13.2 | Bell removes his hands from his head and puts them in his lap. |
| 02:50:20.1 | Bell puts his hands back on his head. |
| 02:50:23.8 | Bell again removes his hand from his head, and keeping them up, turns his head to talk to Mandarino. |
| 02:50:28.5 | Bell drops his hands into his lap. |

| | |
|---|---|
| 02:50:36.1 | Bell sits back in the vehicle, his left foot on the ground. |
| 02:50:41.8 | Believing that Bell "looked like he was starting to comply," Mandarino places his gun in his holster. |
| 02:50:42.5 | Stalbaum begins to exit the car. Mandarino takes a few steps toward the passenger side. Mandarino tells dispatch Bell's licence plate and advises that two subjects are trying to get out of the vehicle. Mandarino testifies that he orders Stalbaum to turn around and show him his hands. |
| 02:50:44.5 | Bell peeks his head out of the car.<br><br>Mandarino testifies that Stalbaum says, "I don't have to f***ing listen to you. I'm not the driver." |

| | |
|---|---|
| 02:50:44.8 | Stalbaum's back is turned toward Mandarino, as Mandarino removes his Taser from his belt.<br><br>Mandarino testifies that he tells Stalbaum to "get back in the vehicle, [and] close the door." |
| 02:50:47.4 | Stalbaum walks toward the house. Mandarino approaches from his right side. Mandarino testifies that he tells Stalbaum to get down on the ground and that he was under arrest. |
| 02:50:49.0 | Stalbaum faces the house, his head bent toward Mandarino. |
| 02:50:50.5 | Stalbaum takes another step toward the house. He testifies that Mandarino was about six to seven feet away.<br><br>Mandarino relates that he tells Stalbaum, "Get on the ground, you're under arrest."<br><br>Mandarino testifies that Stalbaum stuck out his chest and said, "F*** you." Mandarino says he could tell Stalbaum was intoxicated, and feared Stalbaum would become combative.<br><br>Stalbaum testifies that he responded, "What did I do? I'm just the passenger." |

| | |
|---|---|
| 02:50:58.3 | Mandarino deploys the Taser, striking Stalbaum's chest. Stalbaum hunches over and falls out of view.<br><br>Mandarino testifies that Stalbaum fell to his knees and forearms and that the Taser immobilizes a subject for five seconds. |
| 02:51:00.8 | Hearing the Taser and Stalbaum's cries, Bell slowly begins exiting the car. |
| 02:51:01.2 | Stalbaum has dropped the can, which rolls into view. |
| 02:51:03.8 | Bell, standing outside of the car with his hands up, looks over his shoulder and over the car at Mandarino and Stalbaum. Mandarino shines his flashlight in Bell's face.<br><br>Mandarino tells Bell to "put your hands where I can see them."<br><br>Bell replies, "My hands are in the clear." |

| | |
|---|---|
| 02:51:13.0 | Bell puts his hands on his head and slowly turns to face Mandarino and Stalbaum.<br><br>Mandarino testifies that he directs Bell to get back inside the car and close the door. Bell relates that he asks, "Why are you stopping me? You have no right to stop me. What are you doing?" |
| 02:51:16.8 | Mandarino hunches over Stalbaum, who is on the ground. He testifies that he instructs Stalbaum to get all the way down on the ground, and that Stalbaum yells, "F*** you. I don't have to listen to you." Stalbaum tries to get up.<br><br>About this time, Bell's neighbor, Joshua Hall, begins watching the scene from across the street and Bell's brother, Stacey, begins watching from inside the townhouse. |
| 02:51:18.2 | Mandarino spends the next few moments dividing his attention between Bell and Stalbaum while shining his flashlight at Bell.<br><br>Mandarino testifies that he tells Bell to get back in the car and close the door. He says Bell was becoming increasingly agitated. |
| 02:51:59.4 | Mandarino puts the flashlight away. He tells dispatch that one subject is tased and "another subject advised to stay in the car." |

| | |
|---|---|
| 02:52:03.8 | Bell quickly puts his hands in the air.<br><br>Mandarino testifies that Bell shouts, "You have no right to stop me. I'm on my f***ing driveway. What's your f***ing problem."<br><br>Stacey and Hall testify that they never heard Bell swear at Mandarino. |
| 02:52:05.3 | Mandarino again retrieves his flashlight from his belt. He tells Bell to get back in the car and close the door.<br><br>About this time, Mandarino deploys the Taser on Stalbaum for a second time, but it is no longer effective. |
| 02:52:08.1 | Bell puts his hands back on his head. |
| 02:52:25.9 | Bell stands on his toes trying to look over the vehicle. |

| | |
|---|---|
| 02:52:39.5 | Bell gestures sharply at Mandarino, while saying something, and then puts his hands back on his head. |
| 02:52:40.3 | Mandarino backs away from Stalbaum and partly turns toward Bell.<br><br>About this time, the front door of townhome opens. Stalbaum testifies that Bell's brother, Stacey, was at the door. Stacey announced himself to Mandarino.<br><br>Stacey testifies that Mandarino was telling Stalbaum that he needs to stay down.<br><br>Mandarino testifies that he tells Stacy to stay inside the house. |
| 02:52:43.9 | Bell puts his hands back on his head. |

| | |
|---|---|
| 02:52:47.0  | Mandarino steps further back from Stalbaum and returns the flashlight to his belt.<br><br>The lights inside the townhome turn on. |
| 02:52:52.5  | Taking a few more steps back, Mandarino removes and extends his collapsible baton.<br><br>Mandarino testifies that Bell says, "You have no f***ing right to stop me." |
| 02:52:54.2  | With the baton placed over his right shoulder, Mandarino walks toward Bell, who has his hands on his head.<br><br>Bell testifies that Mandarino only told him to "put your hands where I can see them and get down."<br><br>Mandarino testifies that he told Bell to "get all the way down on the ground."<br><br>Hall, watching from across the street, testifies that Mandarino told Bell "to get down on the ground." |

| | |
|---|---|
| 02:52:56.2 | Bell falls to his knees, his hands up in the air. Mandarino stands in front of him, the baton over his right shoulder, pointing at Bell with his left hand. |
| 02:52:59.7 | Mandarino steps just to the right of Bell, who is kneeling, hands on his head, and his head looking down. Mandarino points at Bell with his left hand.<br><br>Mandarino testifies that he tells Bell to get all the way down on the ground. He further testifies that he notices Stalbaum stirring on the porch. |
| 02:53:00.9 | Mandarino grabs Bell's right arm and pulls Bell forward. Bell puts his left hand on the ground.<br><br>Mandarino testifies that he "wanted to get him [Bell] out of that fighting position." He felt Bell's right arm begin "to lock up, flex up. I felt him starting to rise up. I continued to pull down and I felt him begin to reach forward."<br><br>Stacey testifies that he heard Bell saying, "I still don't understand what I did. What did I do?" |

| | |
|---|---|
| 02:53:01.8  | Mandarino forces Bell's right arm onto the ground.<br><br>Mandarino testifies, "I began to step back because I feel he was getting in a highly agitated state that I've seen before and I knew it was a matter of time he's going to get up and fight me. As I'm moving back, my left hand is still on him and I feel his body is still rising up as I'm moving backward." |
| 02:53:02.5   | Bell is on his hands and knees. Mandarino raises the baton above his left shoulder and swings it, striking Bell's upper right arm. (First strike.)<br><br>Mandarino testifies that he was attempting to get Bell to lay flat.<br><br>Bell testifies that he asks "[W]hy are you hitting me?"<br><br>Stalbaum testifies that Bell cried out, "Why are you doing this to me?"<br><br>Stacey testifies that he yelled from inside the house, "Why are you striking him? He didn't do anything. He's following your commands."<br><br>Hall crosses from his side of the street, saying, "Whoa, whoa, whoa, stop." |
| 02:53:03.5   | Mandarino strikes the back of Bell's leg. (Second strike.)<br><br>Bell begins rising to his knees. |

| | |
|---|---|
| 02:53:04.0  | Mandarino strikes Bell's right hand or arm. (Third strike.)<br><br>Mandarino testifies that, as he was striking Bell, he repeatedly instructed Bell to get all the way down on the ground. Mandarino says Bell tries to reach for Mandarino's holster. |
| 02:53:04.8 | Mandarino strikes Bell's right hand or arm, as Bell guards his head. (Fourth strike.)<br><br>Mandarino testifies that he fears that Bell would pull Mandarino's leg up and force him to the ground and feels "extreme fear for [his] safety." |
| 02:53:05.5 | Mandarino strikes Bell's right arm. (Fifth strike.)<br><br>Bell testifies that he protested, saying "I don't deserve to be treated like this. I don't understand. You still haven't told me what I got pulled over for and I thought I was doing everything you commanded me to." |
| 02:53:06.3 | Mandarino strikes Bell's right arm as Bell holds it above his head. (Sixth strike.) |

| 02:53:06.9 | Mandarino strikes Bell's right elbow or forearm as Bell shields his head with his arm. (Seventh strike.) |
|---|---|
| 02:53:07.5 | Mandarino strikes Bell's right arm as Bell shields his head with his arm. (Eighth strike.) |
| 02:53:08.0 | Mandarino strikes Bell's right arm as Bell holds it above his head. (Ninth strike.) |
| 02:53:08.1 | Stacey comes out the front door. Stalbaum stands up. |

| | |
|---|---|
| 02:53:09.0  | Mandarino strikes Bell's right arm as Bell shields his head with his arm. (Tenth strike.) |
| 02:53:09.8 | Mandarino strikes Bell's right arm as Bell shields his head with his arm. (Eleventh strike.) |
| 02:53:10.5 | Mandarino strikes Bell in the head. Bell falters, bleeding. (Twelfth strike.)<br><br>Mandarino testifies that he did not intentionally strike Bell in the head, but "was aiming for [Bell's] shoulder area with a back hand strike, I believe I struck his shoulder and I believe that's when it deflected and struck his ear." |
| 02:53:11.2 | Mandarino strikes the right side of Bell's chest as Bell collapses. (Thirteenth strike.) |

| | |
|---|---|
| 02:53:11.9 | Mandarino strikes Bell's back as he goes to the ground on his knees and forearms. (Fourteenth strike.) |
| 02:53:12.9 | Mandarino strike's Bell's back. (Final and fifteenth strike in the span of 10 seconds.)<br><br>Mandarino testifies that he used force on Bell to "get control and compliance."<br><br>After landing the last strike, Mandarino looks up and sees Stacey approaching. |
| 02:53:13.5 | Stacey stops, Mandarino takes a quick step back while pointing at Bell.<br><br>Mandarino testifies that he stopped hitting Bell because he "believed that he wasn't rising up anymore," and that Stacy presented a greater threat to him.<br><br>Mandarino shouts at Stacey, "Stop, don't come any closer."<br><br>Stacey testifies that he says, "Why are your hitting my brother?" and "I'm not a threat, but you don't have a right to strike him and beat him like you're beating him." |

| | |
|---|---|
| 02:53:14.3 | Mandarino points his baton at Stacey, and Stacey points at Bell.<br><br>Bell testifies that he says, "Stacey, I didn't do anything wrong. I don't understand why I got pulled over for and why he beat me." |
| 02:53:16.9 | Mandarino takes a step toward Bell, and points his baton at Bell. According to Bell, Mandarino tells Bell to "Shut the f*** up." |
| 02:53:19.7 | Mandarino takes a step back, still pointing his baton at Bell. |
| 02:53:21.0 | Stacey gestures at Bell, who is lying on the ground weeping. Stacey testifies that he asks Mandarino, "What do you want him to do?" |
| 02:53:25.7 | Stalbaum emerges from the house. |
| 02:53:26.1 | Stacey takes a step forward, gesturing at Bell, then takes a step back.<br><br>Mandarino testifies that he says, "I want him to get all the way on the ground." |
| 02:53:39.1 | Stacey points at Bell and tells him to get all the way on the ground. |
| 02:53:40.8 | Mandarino points his baton at Stacey, who takes a step back. Stacey testifies that he tells Mandarino, "I'm not a threat. Why are you beating my brother?"<br><br>Mandarino says, "I told him to get down on the ground."<br><br>Stacey responds, "He is down on the ground." |
| 02:53:41.3 | Bell gets up slightly, his knees and left forearm still on the ground. Mandarino steps toward him, pointing his baton at Bell. |

| | |
|---|---|
| 02:53:43.2 | Bell rises a little more, his knees and left hand still on the ground. |
| 02:53:44.8 | Mandarino feigns to hit Bell, and Bell gets back on his knees and forearms. |
| 02:53:46.1 | Stacey gestures at Bell to stay down. Stacey testifies that he tells Mandarino, "I'm going to approach my brother and pull him like you asked. Maybe he just didn't understand you correctly because you didn't give him the command to lay flat on the ground." |
| 02:53:50.7 | Stacey takes Bell's wrists and pulls him flat on the ground. Mandarino points the baton at Stacey. |
| 02:53:52.7 | Stacey backs away from Bell and Mandarino. Bell testifies that he asks Mandarino, "Why did I get pulled over? Why did you do this to me?" |
| 02:53:56.9 | Mandarino points at Stalbaum standing in the doorway of the house. Stalbaum shuts the door. |
| 02:54:20.5 | A police cruiser enters the frame from the left and obstructs the camera's view. |

¶ 7 Bell was placed under arrest. He resisted efforts to place him in handcuffs, and once in the squad car, kicked at a window several times before an officer instructed him to stop.

¶ 8 Bell was first taken to the Streamwood police station and examined by paramedics. He refused to allow the paramedics to treat him, telling them to get "the f*** away from [me]," and "This is bullsh***. I don't know what the f*** you guys are doing here. I am not supposed to be here." The paramedics described him as intoxicated and agitated, and they took Bell to St. Alexis Hospital. There, he refused to let the nurses examine him, draw blood or take a urine sample. He also demanded to talk to an attorney and asked that pictures to be

taken of his injuries. The treating physician, Dr. Mona Lala, testified that Bell had contusions to his arms.

¶ 9 Bell testified that he had a concussion. Dr. Lala did not diagnose him with or treat him for a concussion, but on discharge, Bell was instructed on the possibility of a concussion. Dr. Lala testified that there is no treatment for a mild concussion and that patients are typically discharged with instructions.

¶ 10 Lala described Bell as "combative and agitated" and a security risk. She noted that he smelled of alcohol and appeared intoxicated, and that blunt force trauma to the head could have caused Bell's combativeness. Several hours after being admitted and pictures having been taken of his injuries, Bell permitted the staff to treat him. He received seven stitches in his right ear.

¶ 11 After treatment, Bell was returned to the Streamwood police station, where he was charged with driving under the influence. Stalbaum was charged with resisting arrest. The charges against both of them were later dropped.

¶ 12 The State charged Mandarino with aggravated battery and official misconduct. Mandarino waived his right to a jury trial and proceeded with a bench trial.

¶ 13 Among Mandarino's witnesses was Larry Danaher, who testified as an expert in the use of force. Danaher testified that the use of force is a continuum from the least force and escalating to higher levels of force: (1) the officer's presence on the scene; (2) verbal commands; (3) use of empty hands such as grabbing or holding; (4) control devices such as a Taser or pepper spray; (5) use of an impact weapon such as the collapsible baton; and (6) lethal force.

¶ 14 Danaher believed that the traffic stop became high risk once Bell and Stalbaum exited the car because they might have been armed or dangerous, and because Bell and Stalbaum were agitated and intoxicated, they were more dangerous. According to Danaher, Mandarino properly drew his gun and commanded Bell and Stalbaum to return to the car. The risk level increased when Bell and Stalbaum did not follow this order, and Mandarino could not safely retreat and wait for backup. Also, Mandarino could not safely go "hands on" with Stalbaum as long as multiple subjects were present, so tasing Stalbaum was appropriate.

¶ 15 When Bell got out of the car, while Stalbaum was tased, Danaher believed Bell became a threat. And, while Bell was on his knees in front of Mandarino, a position that Danaher described as the "wrestler position," Danaher contended that Bell could have lunged at Mandarino, and it would have been safer for Mandarino to have kept a greater distance.

¶ 16 From an officer's safety standpoint, Danaher testified that Bell should lie flat on his stomach with arms and legs extended. When Bell rose to his knees after Mandarino struck him twice, Bell took what Danaher called a threatening position. Danaher testified that an officer should strike a person as often as necessary to gain compliance or immobilize him or her. He further characterized Bell's actions as actively resisting, as opposed to passively resisting, Mandarino's commands. Considering the totality of the circumstances–including Bell's age, the possibility that Bell and Stalbaum were armed, their intoxication and profanity, and the lack of officer backup–Danaher opined that Mandarino's use of force on Bell was justified.

¶ 17     The State called Streamwood Police Department Deputy Chief Keegan to testify that the area around Juniper Circle was a low crime, nongang area. On cross, Keegan testified he had known Mandarino for 15 years and held him in high regard. Keegan further testified that Mandarino received outstanding marks on evaluations and that he had never known Mandarino to abuse a suspect. Keegan said that Streamwood police are trained to maintain their distance, space, and cover when they are alone and dealing with multiple suspects. He was also asked about the substance of Mandarino's outstanding evaluations.

¶ 18     On redirect, Keegan stated that he would have evaluated Mandarino differently based on his actions toward Bell and Stalbaum. Keegan said that he found Mandarino's actions in this situation unacceptable. Keegan believed it was improper for Mandarino to draw his gun. He opined that Mandarino should have stayed behind the cover of his squad car door. Keegan also commented that Mandarino's use of the baton was "inappropriate and unnecessary."

¶ 19     Mandarino testified that the written procedures of the Streamwood police department classify the police baton as a nondeadly weapon, but they acknowledge that the baton could be lethal and should not be raised above the officer's head or used as a club.

¶ 20     The trial court delivered an oral verdict on March 23, 2011. The judge said the video was "very telling of what occurred that night." He found that neither Bell nor Stalbaum "told the whole truth," and they were intoxicated. While Mandarino considered the traffic stop high-risk, the trial court said he "was a little surprised to see immediately, in 44 seconds flat, the handgun coming out pointed directly at Mr. Bell and Mr. Stalbaum," followed shortly by the tasing of Stalbaum and then the striking of Bell, who "was on all fours."

¶ 21     Regarding the use of force on Bell, the trial court said that "any rational analysis, in viewing the video, would indicate that the conduct of the defendant was wrong, just plainly wrong. I think his conduct is such that it was unprovoked, unnecessary, and in my opinion, totally unacceptable. I didn't see any provocation, and I looked so hard for that provocation. I had to watch that video 55 to 60 times last night. And I saw none." The trial court went on to state that "there's no doubt, no doubt at all, that this baton is used as a deadly weapon. It was used as a club, a club over Mr. Mandarino's head with full force. This wasn't a tap. This was full force. In the head, in the back, in the right arm, the forearm, and so forth. Clearly, it's a deadly weapon."

¶ 22     Regarding the charge of aggravated battery resulted in great bodily harm, the trial court found Mandarino guilty based on "a combination of the entire striking to the back, to the side, to the ear, to the entire body," the testimony of a mild concussion, and the seven stitches.

¶ 23     The trial court denied Mandarino's motion to reopen the proofs and other posttrial motions, and sentenced him to 30 months' probation and 150 hours of community service. Defendant Mandarino filed a timely notice of appeal.

¶ 24                        ANALYSIS

¶ 25               I. Deputy Chief Keegan's Testimony

¶ 26     Mandarino argues that the trial court erred by allowing Deputy Chief Keegan, a lay

witness, to testify to his opinion that Mandarino's use of force on Bell was unreasonable and unnecessary. The State responds that Mandarino forfeited the issue by failing to object to Keegan's opinion. We agree.

¶ 27 "Where a defendant fails to object to an error at trial and include the error in a posttrial motion he or she forfeits ordinary appellate review of that error." *People v. Brewer*, 2013 IL App (1st) 072821, ¶ 18. When Keegan was giving his opinion, Mandarino objected that it was "beyond the scope," "calls for speculation," and was inconsistent with Keegan's prior testimony. Mandarino failed to apprise the trial court of the objection he now urges on appeal–that the testimony was improper opinion testimony by a lay witness. Nor did Mandarino raise the issue in a posttrial motion. Appellate arguments must correspond to the objections at trial; otherwise, the issue is forfeited for purposes of appeal unless Mandarino shows plain error.

¶ 28 The State argues that the admission does not amount to plain error under the doctrine of curative admissibility. The first step in conducting plain-error review is to determine whether error occurred at all. *People v. Walker*, 232 Ill. 2d 113, 124 (2009). There is no error in allowing inadmissible evidence where the opposing party opens the door to its admission. See *People v. Williams*, 192 Ill. 2d 548, 571 (2000) ("A criminal defendant cannot complain on appeal of the introduction of evidence which he procures or invites.").

¶ 29 Under the doctrine of curative admissibility, in a criminal case, if the defendant on cross-examination opens the door to a particular subject, the State on redirect examination may question the witness to clarify or explain the subject brought out during, or remove or correct any unfavorable inferences left by, the defendant's cross-examination, even if this elicits evidence that would not be proper or admissible. See *People v. Manning*, 182 Ill. 2d 193, 216-17 (1998); *People v. Liner*, 356 Ill. App. 3d 284, 292-93 (2005). The doctrine is protective, and only shields a party from unduly prejudicial inferences raised by the other side. *Liner*, 356 Ill. App. 3d at 293. The decision to allow curative evidence lies within the sound discretion of the trial court. See *Manning*, 182 Ill. 2d at 216-17 (citing *People v. Chambers*, 179 Ill. App. 3d 565, 581 (1989)).

¶ 30 Here, on cross examination, Mandarino elicited testimony from Keegan regarding Mandarino's exceptional performance and service records. Mandarino also solicited testimony that when an officer who is alone and must deal with multiple subjects, it is best for the officer to maintain distance, space, and cover away from the subjects. Keegan further testified, if distance, space, and cover are not feasible options for the officers, then he or she should "keep everybody under visual observation" and radio for assistance.

¶ 31 On redirect, Keegan opined that Mandarino's actions toward Bell and Stalbaum were inconsistent with his exceptional record of service. Keegan stated that Mandarino should not have approached Bell and Stalbaum, but stayed with cover and distance behind the squad car door. Keegan also stated that Mandarino's use of the baton on Bell was "inappropriate and unnecessary."

¶ 32 The questioning and testimony of Keegan by counsel for Mandarino opened the door. Generally, character evidence is neither relevant nor admissible. But, Rule 404 of the Illinois Rules of Evidence provides an exception: "Evidence of a person's character or a trait of

character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except: (1) Character of Accused. In a criminal case, evidence of a pertinent trait of character offered by an accused, or by the prosecution to rebut the same." Ill. R. Evid. 404(a)(1) (eff. Jan. 1, 2011). Keegan's testimony of Mandarino's outstanding evaluations served as evidence of his good character and was probative in determining whether he was capable of acting in the manner charged. *People v. Sandham*, 276 Ill. App. 3d 86, 92 (1995) ("Evidence of defendant's good character as it relates to the nature of the crimes charged *** is admissible ***."), *rev'd on other grounds*, 174 Ill. 2d 379 (1996). Under Rule 404(a)(1), the State was permitted to rebut Mandarino's character evidence. See *People v. Lewis*, 25 Ill. 2d 442, 445 (1962) ("Once the accused offers proof of his good character, the prosecution may cross-examine and offer evidence of bad character in rebuttal."). This rebuttal also allowed the State to cure any impression left by Keegan's testimony that he still considered Mandarino to be an outstanding officer. Thus, the court did not abuse its discretion in admitting Keegan's opinion. The prosecution may rebut character evidence offered by a criminal defendant by offering its own character evidence.

¶ 33    In dissent, Justice Sterba argues that admission of Keegan's redirect testimony was improper and constituted plain error. As discussed above, we do not believe the trial court erred in permitting Keegan's opinion testimony as a rebuttal. But, assuming *arguendo* that the dissent is correct that it was improper, we disagree it rises to the level of plain error.

¶ 34    Under the plain error doctrine, a reviewing court may consider unpreserved error if either: (1) the evidence is so closely balanced that the error alone threatens to tip the scales of justice against the defendant, regardless of the seriousness of the error; or (2) the error is so fundamental and of a magnitude that it affects the fairness of the trial and challenges the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Eppinger*, 2013 IL 114121, ¶ 18. The purpose of the plain error exception "is to correct any serious injustices which have been done to the defendant." *People v. Carlson*, 79 Ill. 2d 564, 576 (1980). To determine whether evidence is closely balanced requires the reviewing court to examine the strengths and weaknesses of the evidence against the defendant. *Id.*

¶ 35    The evidence is not so closely balanced that Keegan's lay opinion testimony alone can be said to have tipped the scales against Mandarino. The key evidence was the video recording, with the trial testimony largely ascribing a narrative to the silent footage. The trial court repeatedly and "intently" (trial court's word) watched the video before making its decision because, as the trial court said in ruling, "the video is very telling of what occurred," and "any rational analysis, in viewing the video, would indicate that the conduct of the defendant was wrong, just plainly wrong. I think his conduct is such that it was unprovoked, unnecessary, and in my opinion, totally unacceptable." This stop was for reckless driving, a traffic matter, a routine patrol duty of police officers.

¶ 36    Even if it were considered a high-risk stop, that does not explain Mandarino's striking Bell a total of 15 times in 10 seconds. What was it about this stop that caused Mandarino to resort to such force? The video shows that Bell never threatened, touched, or moved toward Mandarino thereby putting Mandarino's safety in harm's way, or at any time made a movement, let alone an attempt, to flee the scene, as the dissent implies. See *infra* ¶ 115. The "aggressive behavior" displayed by Bell was, according to the trial testimony, Bell's

-26-

swearing in loud tones at the defendant, something that police officers deal with often in their careers. Words alone are usually all a person has when in a stop like the present one, and nothing in the words employed here would justify the beating Bell endured. As the trial court noted, he did not believe Bell or Stalbaum ever posed a threat to Mandarino.

¶ 37　　No matter how hard the dissent tries to place great weight on Keegan's redirect, tries to suggest that it somehow colored the judge's ruling, not one word of his ruling mentions Keegan or his testimony. While, during the posttrial hearing, the trial judge made a passing reference to Keegan's testimony–that Mandarino should have retreated and taken cover had "stuck with" him–to treat such a passing remark as reversible error is an overly zealous treatment of what the judge said. And, Keegan's redirect sheds little light on the ultimate issue of fact, Mandarino's use of force against Bell. But, even if it did go to the ultimate issue, the testimony at issue was elicited by the defendant on cross-examination and only then expounded on the State's redirect. The following is the exchange between Keegan and defense counsel:

"Q. Well, in the cover-and-contact training that you provide within the Streamwood police department, does it attempt to educate officers in terms of situations that they may encounter where they're the only officer on the scene and there are multiple individuals that they're engaged with?

A. That's correct. All of our training covers different principles and scenarios that an officer would come in contact with.

Q. With respect to where an officer comes into contact with multiple individuals and he is alone at the scene, can you explain to Judge Fecarotta, is it consistent with the training that you give you officers that they attempt to keep the individuals confined in a particular area until backup arrives at the scene?

A. I wouldn't agree with that statement.

Q. Could you explain how you would disagree?

A. When you're dealing with multiple occupants or multiple persons by yourself, you want to give distance and space and cover. I think that's your primary focus. If that can't happen, there's other situations we train for; but our primary focus would be distance, space, and cover. *** But if you can't have space, cover, and distance, you try to retreat and keep everybody under your watchful eye to protect yourself."

¶ 38　　In reaching its conclusion that Keegan's testimony constituted plain error, the dissent discounts or gives short-shrift to the testimony of Bell, Stalbaum, Stacey, and Bell's neighbor, Hall, all of which was highly consistent. Instead, the dissent relies almost exclusively on the defendant, and the testimony of the expert, and the medical personnel who were not at the scene. But, as the trial court stated, "It's about the evidence and about what the evidence has shown," and the trial court's findings should be given deference. *People v. Sanchez*, 2012 IL App (2d) 120445, ¶ 18 (holding determinations of the trier of fact are given great deference, and conviction set aside only if evidence so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of guilt).

¶ 39                    II. Unaware Camera Recording

¶ 40    Mandarino argues that the trial court came to an unreasonable and speculative conclusion that he did not know his squad car camera was recording during the incident. Mandarino asserts that the trial court used this inference to conclude that he was not credible when he testified that he knew the camera was recording. As the State's brief indicates, the trial court never found Mandarino not credible on this point. The trial court's comment,"I'm curious whether or not the defendant knew the video was on," makes no factual determination at all regarding Mandarino's testimony on the video capturing the events at issue.

¶ 41    Rather, in context, the comment hangs as nothing more than a passing thought about the 75 seconds of "watching the rain hit the dashboard," and Mandarino's knowledge of the video recording the "rain hit the dashboard." This has no bearing on any of the court's ultimate rulings. Therefore, the statement is not subject to this court's review.


¶ 42                     III. Motion to Reopen Proofs

¶ 43    Mandarino filed a posttrial motion to reopen proofs based on the trial court's comment wondering "whether or not the defendant knew the video was on." In the motion, Mandarino offered an affidavit from the video equipment manufacturer explaining that the camera prerecords footage up to two minutes before the officer activates his or her emergency lights. Mandarino argued that the trial court considered whether he knew the video was on and therefore should reopen proofs on the issue. The trial court denied the motion to reopen proofs. Mandarino argues that the trial court abused its discretion. We disagree.

¶ 44    A trial court in considering a motion to reopen proofs takes into account "various factors, including the existence of an excuse for the failure to introduce the evidence at trial, *e.g.*, whether it was inadvertence or calculated risk; whether the adverse party will be surprised or unfairly prejudiced by the new evidence; whether the evidence is of utmost importance to the movant's case; and whether there are the most cogent reasons to deny the request." (Internal quotation marks omitted.) *People v. Figueroa*, 308 Ill. App. 3d 93, 103 (1999). The trial court has wide discretion in deciding to reopen proofs. We review the denial of a motion to reopen proofs for an abuse of discretion. *People v. Goff*, 299 Ill. App. 3d 944, 948 (1998).

¶ 45    Because the manufacturer's testimony was not remotely relevant to any of the court's findings, the court properly denied Mandarino's motion. The trial court need not reopen the record to admit ancillary and unnecessary evidence. Further, Mandarino tries to make the trial court's otherwise inconsequential comment into something of substance. But as already explained, the trial court's comment about the 75 seconds of "watching the rain hit the dashboard" does not form any basis of the verdict.


¶ 46              IV. Provocation and Reasonableness Standard

¶ 47    Mandarino argues that the trial court applied a provocation standard instead of a reasonableness standard when evaluating his use of force. The State counters that the trial court's ruling indicated that the appropriate standard, the reasonableness standard, was used. We agree with the State. "Whether the trial court applied the correct legal standard is a

question of law, which is subject to a *de novo* standard of review on appeal." *People v. Cameron*, 2012 IL App (3d) 110020, ¶ 26.

¶ 48 The standard for an officer's use of force is codified in the Criminal Code of 1961. An arresting officer need not retreat or desist from efforts to make a lawful arrest because of resistance to the arrest. 720 ILCS 5/7-5(a) (West 2006). The officer "is justified in the use of any force which he reasonably believes to be necessary to effect the arrest and of any force which he reasonably believes to be necessary to defend himself or another from bodily harm while making the arrest." *Id.* Mandarino cites the standard set forth in *Graham v. Connor*, 490 U.S. 386 (1989). In *Graham*, the Supreme Court applied a reasonableness standard–"the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. "Relevant circumstances include 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.' " *Small v. McCrystal*, 708 F.3d 997, 1005 (8th Cir. 2013) (quoting *Graham*, 490 U.S. at 396).

¶ 49 Mandarino focuses on the trial court's remarks "I think any rational analysis, in viewing the video, would indicate that the conduct of the defendant was wrong, just plainly wrong. I think his conduct is such that it was unprovoked, unnecessary, and in my opinion, totally unacceptable. I didn't see any provocation, and I looked so hard for that provocation. I had to watch that video 55 to 60 times last night. And I saw none." This holding indicates that the judge applied the proper standard. The trial judge held there was no basis for Mandarino's particular use of the baton on Bell. The words "unprovoked" and "provocation" do not indicate or suggest that the judge applied a provocation standard. The terms do, however, demonstrate that the judge considered whether Bell somehow resisted or obstructed Mandarino–a relevant consideration under the reasonableness standard. See *Small v. McCrystal*, 708 F.3d at 1005 (considering threat, resistance, and flight)**.**

¶ 50 The statute prohibits a person from committing a physical act of resistance or obstruction, that is, a physical act that impedes, hinders, interrupts, prevents or delays the performance of the officer's duties. *People v. Raby*, 40 Ill. 2d 392, 399 (1968) (*e.g.*, going limp, forcefully resisting arrest, or physically helping another party to avoid arrest); *People v. McCoy*, 378 Ill. App. 3d 954, 962 (2008) (same). This determination is made by the trier of fact. *Id.*

¶ 51 Here, the trial court found Mandarino was not in a situation in which it was necessary to defend himself or another from bodily harm. Bell was noncombative, nonaggressive, and nonhostile. Nothing in the video indicates any physical actions by Bell that would necessitate Mandarino to use his baton, let alone in the excessive manner in which he employed it. Physical actions should not be confused with verbal agitation, and just because Bell may have "mouthed off" and swore, he never said a word that would have caused Mandarino concern for his safety. Moreover, words said in anger are of no consequence to an experienced officer like Mandarino. His testimony that he feared Bell or Stalbaum was going to fight him does not square with the video.

¶ 52                                    V. Legal Justification

¶ 53        Mandarino argues that his use of force was reasonable to effectuate the arrest given he
was alone and his testimony that Bell used profanity, questioned Mandarino's authority,
refused to return to the vehicle, and refused to comply with commands. The State counters
that the evidence here, viewed in a light most favorable to the State, established that
Mandarino was not justified in using the baton on Bell. We review the evidence regarding
legal justification in the light most favorable to the State, to determine whether any rational
trier of fact could have found the element proven beyond a reasonable doubt. *In re Jessica
M.*, 399 Ill. App. 3d 730, 736 (2010). We agree with the State.

¶ 54        With the video footage, what happened during the stop can be seen and is largely
undisputed. In addition, we can see Bell's and Mandarino's actions from the pursuit to the
arrival of backup officers.

¶ 55        There was, however, conflicting testimony with regard to Bell's, Stalbaum's, and
Mandarino's demeanor. Bell testified he was sober, compliant, and simply questioning why
Mandarino stopped him. Stalbaum testified similarly. Mandarino testified that he spoke in
a clear, direct, and professional manner. Mandarino further testified that both Bell and
Stalbaum were drunk and belligerent, about to get up and fight him, and that Bell failed to
obey commands and tried to reach for Mandarino's holstered gun.

¶ 56        The trial court did not credit Mandarino's testimony, disbelieving that Bell posed a threat
to Mandarino during the course of the stop, and describing Mandarino's use of the baton on
Bell as "wrong, just plainly wrong." A rational trier of fact could easily reach the same
conclusion. Mandarino stopped Bell for reckless driving. Bell never attempted to flee, never
attacked Mandarino, and never appears to resist Mandarino. "[F]orce is least justified against
nonviolent misdemeanants who do not flee or actively resist arrest and pose little or no threat
to the security of the officers or the public." (Internal quotation marks omitted.) *Small v.
McCrystal*, 708 F.3d at 1005. Mandarino's argument would require this court to disregard
all evidence to the contrary.

¶ 57        Mandarino cites two cases to support his argument that his use of force on Bell was
reasonably justified. Both are distinguishable. In *Duerst v. State of Illinois*, 50 Ill. Ct. Cl. 186
(1998), a solo police officer arrested a motorist for a DUI in a remote area. *Id.* at 188. After
arresting the motorist and placing him in the back of the squad car, the officer requested that
the motorist exit the car and submit to a weapons search. *Id.* at 189. The motorist refused,
and resisted when the officers forcibly removed the motorist from the car. *Id.* The motorist
continued to resist the officer and was injured in the altercation. *Id.* at 189-90. The Court of
Claims found that the officer's use of force was reasonably necessary to effectuate the arrest.

¶ 58        Mandarino analogizes the situation in *Duerst* to his own. But this argument ignores the
trial court's findings that Mandarino's actions were "unprovoked, unnecessary, and ***
totally unacceptable." The trial court essentially found that, unlike the motorist in *Duerst*,
Bell did not resist or threaten Mandarino, and that Mandarino's use of the baton was
unreasonable and excessive.

¶ 59        In *Moore v. Chicago Police Board*, 42 Ill. App. 3d 343 (1976), an off-duty police officer
arrested a man accused of burglary. *Id.* at 344. The man resisted and the officer used his gun

to strike the man, causing him to later receive 29 stitches. *Id.* Mandarino again analogizes his actions to Moore's. But this argument ignores the fact that the suspect in Moore resisted arrest, and was being arrested for a felony. *Id.* at 347. Here, Bell was stopped for reckless driving, a misdemeanor (625 ILCS 5/11-503(b) (West 2010)), and the trial court did not find that Bell resisted arrest.

¶ 60　　　Accordingly, a rational trier of fact could conclude that Mandarino's use of force was not legally justified.

¶ 61　　　　　　　　　　　　　　　　VI. Great Bodily Harm

¶ 62　　　Mandarino next argues that Bell's injuries do not amount to great bodily harm, but only bodily harm. The State argues that the evidence is sufficient to support a finding of great bodily harm. We agree with the State. We review the evidence of great bodily harm in the light most favorable to the State, to determine whether any rational trier of fact could have found the element proven beyond a reasonable doubt. *In re Jessica M.*, 399 Ill. App. 3d 730, 736 (2010).

¶ 63　　　The Criminal Code states that "[a] person commits battery if he or she knowingly without legal justification by any means (1) causes bodily harm to an individual or (2) makes physical contact of an insulting or provoking nature with an individual." 720 ILCS 5/12-3(a) (West 2010). "Bodily harm" requires "physical pain or damage to the body, like lacerations, bruises or abrasions, whether temporary or permanent." *People v. Mays*, 91 Ill. 2d 251, 256 (1982). Aggravated battery occurs, in relevant part, when a person "in committing a battery, other than by the discharge of a firearm, *** knowingly *** [c]auses great bodily harm or permanent disability or disfigurement." 720 ILCS 5/12-3.05(a)(1) (West 2010). "[W]hat constitutes 'great bodily harm' to support a charge of aggravated battery is a question of fact to be determined by the finder of fact." *People v. Crespo*, 203 Ill. 2d 335, 344 (2001). "While the element of great bodily harm does not lend itself to a precise legal definition, it requires proof of an injury of a greater and more serious nature than a simple battery." *In re J.A.*, 336 Ill. App. 3d 814, 815 (2003). The inquiry is not what the victim did or did not do to treat his or her injuries, but what injuries the victim received. *People v. Matthews*, 126 Ill. App. 3d 710, 715 (1984).

¶ 64　　　Mandarino argues that Bell's injuries were limited to the wound behind his ear and that the trial court's finding of a concussion was not supported by the testimony of Dr. Lala. But, the full extent of Bell's injuries were not only the wound behind his ear and a minor concussion. He also suffered from pain in his arm and back from the other dozen or so blows. Based on all of these injuries, the trial court's finding that Bell suffered great bodily harm is not against the manifest weight of the evidence, and is consistent with our case law upholding convictions for aggravated battery for lesser injuries. See *People v. Matthews*, 126 Ill. App. 3d 710, 714-15 (1984) (bruise on head); *People v. Smith*, 6 Ill. App. 3d 259, 264 (1972) (lump on mouth, scar on face, and bruises under chin).

¶ 65　　　Moreover, the fact that Bell was not treated for a minor concussion does not mean that he did not suffer from one. As Dr. Lala made clear, "Monitoring is typically what we do with regard to mild concussions. There is no treatment as such. For a severe concussion, that

requires admission, but mild concussions are often, if not almost all the time, discharged home. So there's no specific treatment with regard to a mild concussion that I could have even give[n] him." Thus, a rational trier of fact could conclude that Bell suffered from a mild concussion.

¶ 66    Even though the dissent concedes that "determination of whether an injury rises to the level of great bodily harm is a question of fact and centers upon the injuries which the victim did, in fact, receive rather than on what treatment the victim received for those injuries," the argument consists of a basic disagreement with the trial court's view of the evidence. *Infra* ¶ 108. The dissent downplays Bell's obviously severe injuries and his testimony that he indeed suffered a concussion. This is a disagreement over the totality of the evidence, which is left in the sound discretion of the trial court. *People v. Ortiz*, 196 Ill. 2d 236, 259 (2001) ("It is the trier of fact's responsibility to determine the witnesses' credibility and the weight given to their testimony, to resolve conflicts in the evidence, and to draw reasonable inferences from the evidence; we will not substitute our judgment for that of the trier of fact on these matters.").

¶ 67                                VII. Use of a Deadly Weapon

¶ 68    Finally, Mandarino argues that the baton was not a *per se* deadly weapon and was not used in a deadly manner. The State counters that the evidence at trial indicated that Mandarino used his baton as a deadly weapon. We agree with the State. We review the evidence of the use of a deadly weapon in the light most favorable to the State, to determine whether any rational trier of fact could have found the element proven beyond a reasonable doubt. *In re Jessica M.*, 399 Ill. App. 3d 730, 736 (2010).

¶ 69    A deadly weapon is defined as any "instrument that is used or may be used for the purpose of an offense and is capable of producing death." *People v. Blanks*, 361 Ill. App. 3d 400, 411 (2005). Some weapons are deadly *per se* (like guns or daggers), while others are objects that may be used as deadly weapons (like small pocket knives, canes, whips, or bats). *Id*. "When the character of the weapon is doubtful or the question depends upon the manner of its use, it is a question for the fact finder to determine from a description of the weapon, the manner of its use, and the circumstances of the case." *Id.* at 411-12.

¶ 70    The trial court heard evidence that the Streamwood police department classifies the collapsible police baton as a nondeadly weapon but acknowledges that the baton could be lethal and should not be raised above the officer's head or used as a club. Thus, the collapsible baton is not a *per se* deadly weapon. But even Mandarino's expert acknowledged that the baton could be lethal if used to strike "the head, throat, side of the neck, [or] chest cavity." The trial court explicitly found that Mandarino raised the baton above his head to strike Bell with full force, in the back, arm, forearm, and head, using the baton improperly as a club. Thus, a rational trier of fact could conclude that Mandarino used the baton as a deadly weapon.

¶ 71    Accordingly, we affirm Mandarino's convictions.

¶ 72    Affirmed.

¶ 73    JUSTICE STERBA, dissenting.

¶ 74    I cannot join in today's decision because I believe Deputy Chief Keegan's testimony on the issue of whether defendant's actions were reasonable was erroneously admitted and constituted plain error because the evidence was closely balanced. Moreover, I disagree with the majority's conclusion that the evidence was sufficient to support a finding of great bodily harm. I would therefore reverse defendant's convictions and remand for a new trial on only those counts that are predicated on use of a deadly weapon or simple battery.

¶ 75    Much like the trial judge, who stated that he viewed the video 50 to 60 times the night before issuing his ruling, the majority overemphasizes and essentially views in isolation a video recording with no audio component, as evidenced not only by its analysis but by its use of isolated screen shots in the background section accompanied by selective, interspersed statements from the testimony of various witnesses. Because I believe the majority's background section is significantly deficient, I will first set forth what I believe to be the relevant facts, including the full accounts of the incident provided by Bell, Stalbaum and defendant.

¶ 76    Bell testified that he pulled his vehicle into the driveway, put it in park, and turned it off before he noticed flashing lights in his rearview mirror. Bell got out of the vehicle and defendant approached him with a drawn weapon and a flashlight. Defendant told Bell and Stalbaum to put their hands where he could see them and get back in the vehicle. Bell put his hands out and sat back in the driver's seat with his back to the passenger seat and his feet still on the ground. Defendant walked around to the passenger side toward Stalbaum, but Stalbaum was outside of the vehicle and the passenger door was closed so Bell could not hear what was being said. Bell then heard a slight buzzing sound and heard Stalbaum shout, so he put his hands up in the air, got out of the vehicle, and asked defendant why he had pulled Bell over and why he was "doing this" to Stalbaum.

¶ 77    Defendant returned to the driver's side of the vehicle and pulled out his baton. Defendant told Bell to put his hands where he could see them and get down, pointing to the ground with the baton. Bell testified that he got down on his knees and put his hands behind his head. Defendant grabbed Bell's arm and pulled him down. Bell testified that he did not resist or make any effort to struggle. Bell put both of his hands on the pavement and defendant began hitting him with the baton. Bell recalled being hit 15 times with the baton on his back, arms and head. Bell said that he asked defendant why he was hitting him, told him to stop, and said he did not deserve to be treated that way. Bell's brother Stacey approached defendant and asked why he was hitting his brother. Stacey asked defendant what he wanted Bell to do, and then explained to the officer that he was going to approach Bell and get him into the position defendant requested. Stacey then approached slowly with his hands in the air and pulled Bell's arms out, making him lie flat on the ground. Defendant then placed Bell under arrest, handcuffed him, and put him in the back of the squad car. Bell acknowledged that he kicked the windows of the squad car a number of times while he was in the backseat.

¶ 78    Stalbaum testified that he did not notice any flashing lights or realize there was a police car behind them until he stepped out of the vehicle at Bell's house. Defendant approached with his gun drawn and told Stalbaum to remain next to the vehicle. Stalbaum opened the

-33-

passenger door, but did not get back into the vehicle. Defendant told Stalbaum to get down on the ground and Stalbaum said, "What did I do? I'm just a passenger." Stalbaum testified that he had no time to comply with defendant's orders before defendant tasered him. Stalbaum collapsed on the ground. He could not move and was having a hard time breathing. He heard Stacey come to the front door. He could not hear defendant saying anything to Bell and could not see Bell, but he heard Bell asking defendant why he was doing that to him. When additional officers arrived on the scene, another officer approached Stalbaum and stood beside him. After he was ordered to get down on the ground, Stalbaum testified that he was slow to respond but thought he got down on the ground and was tasered again by an officer while he was down on the ground. Stalbaum was then handcuffed and taken to the hospital before being transported to the police station and booked for resisting arrest.

¶ 79    Stalbaum acknowledged that he had hired a civil attorney and was one of the plaintiffs in a civil lawsuit filed against the Village of Streamwood. Stalbaum further acknowledged that he had viewed the dashboard camera video with his civil attorney prior to testifying. Bell's brother Stacey confirmed that he was also a plaintiff in a civil lawsuit against the Village of Streamwood and that he had previously viewed the dashboard camera video.

¶ 80    Defendant testified that he pursued Bell's vehicle after hearing squealing tires and noticing that the vehicle accelerated through the intersection. Defendant placed a call to dispatch to report it as a reckless driving incident, and observed the vehicle almost striking the curb as the driver made a left turn. Defendant activated all the lights and the dashboard camera in his patrol car. He then followed the vehicle onto a private driveway. Defendant saw the driver's side door open immediately, so he called the address in to dispatch, requested backup, and exited his own vehicle. Defendant shouted, "Streamwood police department, get back in the vehicle and close the door." Although he gave the order multiple times, the driver did not get back in the vehicle and close the door and the passenger door also opened during this time.

¶ 81    Defendant testified that according to his training, he was to keep the occupants contained in the vehicle until backup arrived. Because Bell, the driver, and Stalbaum, the passenger, were not following his repeated orders to get back in the vehicle and close the doors, he viewed it as a high risk traffic stop and drew his service revolver as he approached the vehicle. Defendant positioned himself behind the vehicle so that he could view both Bell and Stalbaum. Stalbaum exited the vehicle and began walking toward the house. He turned toward defendant and defendant noticed Stalbaum was holding something shiny in his hands, in the way that you would hold a can. Stalbaum said, "You have no right to stop me. I'm not the driver." Stalbaum then started walking back toward the vehicle and shouted, "This is fucking bullshit, what's your problem? You have no fucking right to stop me, I'm not the driver." He appeared agitated.

¶ 82    In the meantime, Bell sat back down in the driver's seat but kept both feet on the ground. He stuck his head out of the door and repeatedly said, "Why did you stop me? You have no right to stop me. I'm on my driveway." Defendant explained that he had stopped him for squealing his tires, improper lane usage, and driving recklessly. Defendant was then able to call dispatch with the license plate number of the vehicle and the information that two individuals were attempting to exit the vehicle. When Bell was seated and Stalbaum started

-34-

to return to the car, defendant holstered his weapon. He immediately noticed Stalbaum moving toward the house again. Defendant said, "Turn around and show me your hands." Stalbaum became agitated and said, "I don't have to fucking listen to you, I'm not the driver." Defendant told Stalbaum to get down on the ground and that he was under arrest. Defendant moved closer to Stalbaum. Stalbaum continued moving toward the front door. He turned around when he reached the stoop, looked defendant in the eye, and said, "Fuck you." Defendant could smell alcohol on Stalbaum's breath.

¶ 83    Defendant took out his Taser and deployed it on the chest area of Stalbaum's body. Stalbaum fell to the ground on his knees. Defendant told him to get all the way down on the ground. Defendant testified that within approximately five seconds of having the Taser applied, a person would regain complete control of his muscles. Immediately after he deployed the Taser on Stalbaum, defendant noticed Bell exiting the vehicle. Defendant told Bell to get back in the vehicle. Bell did not comply, and Stalbaum started to get back up and shouted, "Fuck you, I don't have to listen to you." Defendant deployed the Taser on Stalbaum again, but heard a loud popping noise that indicated that the Taser was no longer effective. Bell was becoming increasingly agitated and started shouting, "You have no right to stop me, I'm on my fucking driveway. What's your problem?" Defendant had his flashlight pointed at Bell and his Taser still touching Stalbaum. Defendant then noticed the front door opening and saw a third male standing inside the storm door. He told the person to stay inside, holstered his Taser, and began backing up in order to get out of the confined space between the vehicle and the front door and maintain a clear line of sight on all three individuals.

¶ 84    Defendant took out his baton and expanded it. Bell continued to shout at him and based on his agitated state and the fact that his speech was slurred, defendant explained that he knew that if Bell advanced toward him he would have to defend himself. Defendant told Bell to get all the way down on the ground. Bell dropped to his knees and put his hands up in the air. Defendant testified that when a subject is on his knees, he is still in a fighting position and he wanted Bell to be prone on the ground. Defendant pointed at the ground and told Bell again to get all the way down on the ground. Bell remained on his knees and put his hands behind his head. Defendant noticed that Stalbaum had begun to move around and knew that it was only a matter of time before he got back up again. Defendant grabbed Bell's arm and began to physically pull him down toward the ground. He felt Bell's arm tense and felt him starting to rise up. Defendant lost his grip on Bell's arm and began to step back. Because of Bell's agitated state, defendant testified that he knew it was only a matter of time before Bell got up and tried to fight him. He made the decision to strike Bell in the arm with his baton in order to get him flat on the ground.

¶ 85    Defendant explained that he was trained to continue striking until he obtained compliance. He hit Bell with the baton a number of times and continued to tell Bell to get all the way down on the ground, but Bell remained on his knees. Defendant testified that he began striking Bell in the forearm area to try and keep him down. After the third strike, Bell rose up and reached toward defendant with his right hand. Defendant said Bell was reaching toward his gun belt and he did not know if Bell would be able to grab his weapon or if he would grab his leg and try to pull him down. Defendant repositioned himself and attempted

to strike the shoulder area instead, and one of those blows deflected off Bell's shoulder area and hit him in the ear. As he was striking Bell with the baton, defendant noticed Stacey, the third individual, leave the house and approach him. When Bell stopped attempting to rise up, defendant stopped striking with the baton and told Stacey not to come any closer. Stacey asked defendant what he wanted Bell to do, and defendant explained that he wanted him to get all the way down on the ground. Stacey began telling Bell to get down on the ground, but Bell remained in the same position. Stacey then reached out and pulled Bell flat on the ground.

¶ 86     Defendant noticed that Stalbaum and Stacey had entered the house. Another officer arrived on the scene and defendant asked the officer to bring Stalbaum and Stacey back outside. Three or four additional officers arrived on the scene and defendant told Bell to put his hands behind his back. Bell refused. Defendant and another officer tried to pull Bell's arms behind his back but defendant finally had to use his baton as leverage in order to pry Bell's arms up so that he could place him in handcuffs. Bell was placed in the backseat of defendant's squad car, where he attempted to kick out the rear windows.

¶ 87     On cross-examination, defendant testified that police procedures refer to the expandable baton as a nondeadly weapon. Under the use of force policy, an officer should first give verbal directions before using nondeadly force. Nondeadly force includes soft hand techniques, spray, Tasers, expandable batons, or canine units. Defendant acknowledged that under Streamwood Police Department policy, a baton can be a lethal weapon if used improperly. He further stated that the baton should not be raised above the head and acknowledged that he had raised his baton above his head during the incident. He stated that he was trained to strike as hard as he could with the baton until he gained compliance, and that he stopped striking Bell with the baton when he could feel that Bell was no longer trying to rise up.

¶ 88     Officers who responded to the scene testified that Bell and Stalbaum were both combative and uncooperative and shouted at the officers. Bell clenched his fists, refusing to put his arms behind his back when instructed to do so by the officers and defendant had to use his baton to get Bell's arms into position so that the officers could put him in handcuffs. Stalbaum braced his arms and back and resisted officers who tried to get him down on the ground and place him in handcuffs. Stalbaum also held his arms at his sides and clenched his fists and officers had to use a Taser in order to handcuff him.

¶ 89     Officer McLean accompanied Bell to the hospital from the police station and participated in the DUI investigation of Bell. McLean testified that Bell refused to take a blood or urine test. Bell told McLean that he had no intention of complying and that he was "too smart" to comply with those tests. Bell told McLean that he was not intoxicated, then asked him how long it would take for anything to get out of his system and asked if 24 hours was long enough. McLean testified that Bell smelled strongly of alcohol and, in McLean's opinion, was highly intoxicated.

¶ 90     Two paramedics testified that Bell was combative, belligerent, aggressive and uncooperative. One paramedic testified that Bell appeared to be under the influence of either drugs or alcohol and the other testified that Bell smelled strongly of alcohol and appeared to be highly intoxicated. Both paramedics testified that Bell's behavior appeared to be related

solely to his intoxicated state and not to any injuries he sustained.

¶ 91    Dr. Lala testified that she treated Bell at the hospital after the incident. Bell seemed agitated and upset. He was also combative and smelled of alcohol. Dr. Lala testified that two hours after he was admitted to the hospital, Bell was determined to be a security risk and was speaking inappropriately. Approximately 3 1/2 hours after his admission, Bell's chart indicated that he was intoxicated, belligerent and uncooperative. Bell's chart also indicated that he refused blood and urine tests. The chart further indicated that Bell denied any head injury, loss of consciousness, headache, dizziness, facial injury, or facial pain. Bell had a laceration on his ear that required seven stitches. Dr. Lala testified that Bell was not diagnosed with a concussion nor was he treated for a concussion, and that his discharge instructions for the treatment of mild concussion did not originate with her. The majority notes that Dr. Lala also testified that there is no treatment for mild concussion, and that blunt force trauma to the head could *possibly* cause a person to act in a combative manner. *Supra* ¶¶ 9-10. Significantly, this testimony was elicited in response to questions regarding what is possible and cannot be considered to be an assessment of Bell's injuries. Dr. Lala further stated that the only thing that can be done for a mild concussion is monitoring.

¶ 92    As the majority notes, Danaher testified that the use of force spans a continuum from the least amount of force required, escalating to higher levels of force. *Supra* ¶ 13. Danaher explained that a use of force continuum is a sliding scale used to guide police officers regarding what level of force is appropriate. The first level on the continuum is uniformed officer presence. If that does not result in compliance, the next level is to give verbal commands. If verbal commands are unsuccessful, the next level is physical or "hands on," and consists of grabbing or holding the individual. If the individual still does not comply, the next level is pepper spray or a Taser, depending on the department. The next level is an impact weapon such as a collapsible baton and the final level is deadly force. Individual circumstances determine whether the officer should progress through each level on the continuum consecutively or whether the officer needs to go straight from officer presence to the use of force.

¶ 93    Danaher testified that if a subject refuses to comply with verbal commands, the risk level escalates due to potential harm to the officer and to others in the vicinity. The primary objective for an officer in such a situation is to gain compliance and control. Danaher stated that officers are not trained to retreat in those types of situations and that the officer could not have waited for backup because the individuals were outside the vehicle and moving around. Danaher further stated that a subject who is intoxicated heightens the risk because the person is not able to think clearly and can absorb more pain. Danaher explained that in a situation where an officer has to deal with multiple subjects, the officer has to try to anticipate what each subject is going to do and would try to deal first with the person he views as the greatest threat to his own safety as quickly as possible so that he can move on to the others.

¶ 94    Danaher testified that officers are trained to strike with the baton as hard and fast as they can in the arm, shoulder, back or leg areas, if possible. Danaher stated that defendant responded properly by striking the driver in the forearm in an attempt to get him to go down, because the driver still posed a threat to the officer while he was on his knees. Danaher

testified that an officer does not have to stop after a certain number of strikes, but is allowed to continue striking until he gains compliance or can move to the next level if appropriate. In Danaher's opinion, considering the totality of the circumstances, defendant's use of force was reasonable and appropriate.

¶ 95    During Keegan's cross-examination, the defense introduced evidence of a specific evaluation that was conducted by defendant's direct supervisor and reviewed by Keegan. The defense then went on to ask a series of hypothetical questions about what an officer should do in certain situations, using facts specific to the incident in question. On redirect, the trial court allowed the State to pursue a line of questioning related to Keegan's opinion of defendant's actions during the incident in question over defense objections. The trial court explained that the defense had opened the door by asking Keegan what he would have done in a situation involving multiple individuals. After Keegan testified that he did not consider it proper for defendant to have drawn his weapon, defense counsel asked for the record to reflect a continuing objection on personal knowledge grounds because Keegan did not participate in the investigation into the incident. The trial court stated that it had allowed defense counsel to question Keegan regarding an evaluation that Keegan had not conducted, and that defense counsel brought out specifics regarding contacts with individuals in that questioning. Therefore, the trial court overruled the objection, stating that defense counsel opened the door. Keegan ultimately opined that he thought defendant's use of the baton was inappropriate and unnecessary.

¶ 96    In ruling on defendant's posttrial motions, the trial court stated that there was testimony from the deputy chief that what defendant did was wrong and was not part of his training, and that defendant should have retreated and taken cover. The trial court explained, "I think [retreat and take cover] were the words that stuck with me. And after reviewing that video, that makes, you know, sense." The trial court further stated that, from what it could see on the video, Bell did everything he could to comply and the first strike with the baton did not occur until Bell was on all fours. The trial court rejected defense counsel's argument that defendant was taught to strike hard with the baton, stating that was not the testimony it heard. Instead, the trial court stated that the testimony it heard was that the baton should not have been raised over the head. Thus, the trial court did not believe that the conduct was lawful to effectuate the arrest. In considering the evidence in aggravation and mitigation for purposes of sentencing, the trial court noted that the most significant evidence in mitigation was that not one civilian complaint had been filed against defendant in his 15 years as an officer and the State had presented no evidence to the contrary.

¶ 97    The majority first addresses the issue of whether Keegan's testimony was erroneously admitted. Relying on the doctrine of curative admissibility, the majority determines that the defense opened the door to character evidence and that Keegan's opinion that defendant's actions were reasonable was admissible evidence of his bad character. *Supra* ¶¶ 29, 32. I believe the majority's analysis is conspicuously flawed on both the doctrine of curative admissibility and on its treatment of character evidence.

¶ 98    First, I believe the majority inappropriately characterizes Keegan's opinion on the issue of whether defendant's actions were reasonable as character evidence. The relevant character trait at issue in a charge of aggravated battery is defendant's reputation for violence or

-38-

peacefulness. Proof of a specific character trait may be made by testimony as to reputation or testimony in the form of an opinion regarding the relevant character trait. Ill. R. Evid. 405(a) (eff. Jan. 1, 2011).

¶ 99   Defense counsel's introduction of defendant's stellar performance review was evidence of a lack of disciplinary action or complaints, which arguably could tend to generally show the character trait of peacefulness. I note, however, that this court has rejected such logic, observing that there is no case law to support the proposition that testimony that establishes that the defendant has not committed any specific acts of violence is probative evidence of a defendant's good character of peacefulness. *People v. Harris*, 224 Ill. App. 3d 649, 652 (1992). Thus, defendant's introduction of his performance review did not open the door on the issue of his character. Assuming, *arguendo*, that defense counsel did open the door to character evidence by its introduction of defendant's performance evaluation, the proper response from the State would have been to introduce evidence of defendant's violent character. However, the State introduced no such evidence but instead elicited an opinion on the reasonableness of defendant's actions based on Keegan's viewing of the dashboard video recording.

¶ 100   When the testimony is considered in its entirety, including the trial court's comments at the time it overruled defense counsel's objections, it is pellucidly clear that the trial court determined that defense counsel opened the door to Keegan's testimony on the basis of subject matter, not character evidence. The trial court determined that Keegan could testify regarding his opinion of defendant's actions during the incident in question because defense counsel asked questions about what an officer should do when dealing with multiple subjects, not because defense counsel introduced a stellar performance evaluation. The relevant inquiry is, therefore, whether the trial court erred in allowing Keegan to offer his opinion of defendant's actions.

¶ 101   As a general rule, a lay witness is not permitted to express an opinion or draw inferences from the facts because testimony must be confined to statements of fact of which the witness has personal knowledge. *People v. Crump*, 319 Ill. App. 3d 538, 542 (2001) (citing *People v. Stokes*, 95 Ill. App. 3d 62, 66 (1981), and *People v. Sprinkle*, 74 Ill. App. 3d 456, 464 (1979)). There are exceptions to this rule. A lay witness may express an opinion on intoxication based on personal observation and experience. *Id*. A lay witness may also express an opinion based upon his observations where it is difficult to reproduce for the jury the totality of the conditions perceived and the opinion given is one that persons in general are capable of making and understanding. *Id*. Improper opinion testimony is not necessarily prejudicial where the conclusion is an obvious one. *Id*. However, "[l]ay witness testimony is especially improper and prejudicial when it goes to the ultimate question of fact that is to be decided by the [fact finder]." *Id*. (citing *People v. McClellan*, 216 Ill. App. 3d 1007 (1991)).

¶ 102   The record indicates that Keegan was not qualified as an expert witness; therefore, he was a lay witness. Although Keegan was called by the State for the sole purpose of testifying that the area where the incident occurred was a low crime area, I agree with the State that defense counsel opened the door to the subject matter of the incident in question by asking about facts specific to the case. However, when questioning Keegan regarding his viewing

of the dashboard camera video, the State did not restrict its questions to facts within the personal knowledge of the witness. Keegan acknowledged that he did not participate in the investigation and had only viewed the video. The State did not merely phrase its questions in terms of what an officer would generally do in such a situation, based on Keegan's personal knowledge and experience, but asked Keegan for his opinion of the actions taken by defendant. Keegan stated what he thought and believed, and rendered an opinion on the reasonableness of defendant's actions. As a lay witness, Keegan could not offer his opinion of the events on a video recording of which he had no personal knowledge. He was not qualified as an expert witness on the use of force. The conclusion was clearly not an obvious one, as evidenced by the expert testimony of Danaher. Here, the testimony was especially improper and prejudicial because it went to the ultimate question of fact and because it was offered by a deputy police chief and therefore carried more weight. Improperly admitted opinion testimony that is prejudicial is reversible error. *Id*. Thus, the trial court erred in allowing this testimony.

¶ 103     The State's argument that this testimony was admissible under the doctrine of curative admissibility is unavailing. Under the doctrine of curative admissibility, if one party opens the door and the opposing party will be prejudiced unless it can introduce contradictory or explanatory evidence, then the introduction of such evidence is admissible even though it might otherwise be improper. *People v. Manning*, 182 Ill. 2d 193, 216 (1998). However, the doctrine "is not a panacea; it does not permit a party to introduce inadmissible evidence merely because the opponent brought out some evidence on the same subject." *Id*. Rather, the doctrine is limited in scope and design and is "merely protective and goes only as far as is necessary to shield a party from adverse inferences." *Id*. at 216-17. Here, defense counsel opened the door to the subject matter of the generally appropriate response when confronted with a situation where a single officer must deal with multiple subjects who are attempting to move away from the area. This in no way authorized the State to follow up with improper opinion testimony from a lay witness, especially where Keegan's answers to defense counsel's questions on that particular subject did not help defendant's theory of the case and were in fact favorable to the State. The State has not shown that it was unduly prejudiced by Keegan's testimony. Thus, in my view, the doctrine of curative admissibility does not operate to render the otherwise improper testimony admissible.

¶ 104     Because I believe the trial court erred in admitting Keegan's opinion regarding the reasonableness of defendant's actions, I would conduct a plain error analysis. The plain-error doctrine allows a reviewing court to consider unpreserved error if either: (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error; or (2) the error was so fundamental and of such magnitude that it affected the fairness of the trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007); *People v. Herron*, 215 Ill. 2d 167, 178-79 (2005).

¶ 105     Here, I believe the evidence was closely balanced. The video, in isolation, is significant evidence in favor of a finding that defendant's actions in striking Bell with the baton were unreasonable. In contrast, defendant's testimony regarding the attitudes and actions of the subjects, including their refusal to comply with his lawful orders and their profanity-laced,

combative verbal responses, together with the unrebutted testimony of the expert witness that defendant's actions were an appropriate response to the situation and were not unreasonable were evidence that defendant's actions were reasonable. Both subjects testified that they were not intoxicated and did not use profanity but merely asked defendant why he was stopping them; however, both were impeached by testimony from paramedics, medical personnel and other officers regarding their intoxication levels, use of profanity, and general uncooperative and combative attitudes. There was evidence related to defendant's outstanding performance reviews, including evidence that in over 15 years as a police officer he had received no negative comments from the public and had received letters of commendation from external agencies.

¶ 106    The video corroborates defendant's account in many respects. The video shows both subjects immediately exiting the vehicle, the driver not getting completely back in the vehicle, and the passenger starting to return to the vehicle and then walking away again. The video shows defendant pointing at the ground and then attempting to pull Bell to the ground before striking him with the baton when Bell continued to resist. The video further shows that defendant stopped striking Bell with the baton when Bell stopped trying to rise up off the ground. Although the video shows defendant repeatedly and forcefully striking Bell with the baton, the expert witness testified that officers are trained to strike with the baton as hard and fast as they can until they achieve compliance. The expert witness further testified that officers are trained to use a continuum as a guide when determining the appropriate level of force, with uniformed officer presence at the first level, followed by verbal commands, grabbing or holding, Taser, impact weapon and, finally deadly force. Although the expert testified that it does not necessarily follow that an officer must progress through each level sequentially, there was evidence that defendant was in uniform, gave verbal commands, pointed to the ground, attempted to pull Bell down, and finally used an impact weapon. There was also evidence that defendant's Taser was no longer working, leaving him with the option of either his collapsible baton or his firearm to achieve compliance. The expert testified that the baton should not be raised above the head and defendant acknowledged that he did, in fact, raise the baton above his head. However, the video showed that the vast majority of the baton strikes were from the side, with only two or three strikes during the middle of the altercation from somewhat above defendant's head. Thus, the evidence was closely balanced and it came down to the credibility of the witnesses' accounts in providing context for the actions seen on the video and the expert's testimony regarding reasonable use of force and his opinion and ultimate conclusion on the issue.

¶ 107    It is not necessary to speculate whether the error alone threatened to tip the scales against the defendant, because the record contains evidence that the error did, in fact, tip the scales. At the hearing on the posttrial motions, the trial court explicitly stated that its finding was based on the combination of the video and the improperly admitted testimony. However, even in the absence of such an unequivocal statement of reliance by the finder of fact, it is clear that the error alone threatened to tip the scales against the defendant where the State did not produce its own expert on use of force and relied solely on the video, and the improperly admitted testimony carried the additional weight of being an opinion offered by a deputy police chief. I would therefore reverse defendant's convictions for aggravated battery and

official misconduct and remand for a new trial.

¶ 108    I also disagree with the majority's conclusion that the State presented sufficient evidence of great bodily harm. It is axiomatic that great bodily harm cannot be precisely defined; however, it requires an injury of a graver and more serious character than an ordinary battery. See, *e.g.*, *People v. Figures*, 216 Ill. App. 3d 398, 401 (1991); *People v. Costello*, 95 Ill. App. 3d 680, 684 (1981). In the context of simple battery, bodily harm consists of " 'some sort of physical pain or damage to the body, like lacerations, bruises or abrasions, whether temporary or permanent.' " *Figures*, 216 Ill. App. 3d at 401 (quoting *People v. Mays*, 91 Ill. 2d 251, 256 (1982)). The determination of whether an injury rises to the level of great bodily harm is a question for the trier of fact and centers upon the injuries which the victim did, in fact, receive rather than on what treatment the victim received for those injuries. *Id*.; *Costello*, 95 Ill. App. 3d at 684.

¶ 109    In the case *sub judice*, Bell suffered a laceration to his ear that required seven stitches. The State alleged that Bell also suffered a concussion. When ruling on defendant's motion for a directed verdict, the trial court acknowledged that neither the evidence of the stitches nor the evidence of concussion, standing alone, would be sufficient to meet the State's burden of proof at that juncture. When issuing its final ruling, the trial court stated that Bell suffered great bodily harm due to the combination of the stitches and the number of times defendant struck Bell. By way of further clarification, the trial court stated, "[T]here was testimony there was a mild concussion." The trial court then concluded that because there was evidence of both stitches and a concussion, the injuries Bell sustained clearly rose to the level of great bodily harm.

¶ 110    Although a reviewing court must afford deference to the trier of fact's determination on what constitutes great bodily harm, the evidence must support that determination. However, the record discloses no evidence that Bell suffered a concussion. On the contrary, Dr. Lala, the treating physician, specifically stated that he was not diagnosed with a concussion. She further testified that Bell did not complain of any head injury, dizziness, headache or loss of consciousness, symptoms that could indicate a possible concussion regardless of the treatment he received, and that the discharge instructions that included a section on the treatment of mild concussion did not originate with her. Dr. Lala testified that the only thing that could be done for a mild concussion was monitoring. Notably, there was no testimony that Bell suffered symptoms after discharge that could indicate he actually suffered a concussion. Moreover, the video shows one blow deflecting off Bell's arm and striking him on the ear, but no direct blows to the head. The fact that the discharge instructions include instructions for the treatment of mild concussion, apparently as a matter of routine and not based on a specific order from the treating physician, is not evidence that Bell, in fact, suffered a concussion. As previously noted, the determination of whether an injury rises to the level of great bodily harm must center on the actual injuries sustained. The trial court apparently relied solely on the discharge instructions from an unknown source for its conclusion that Bell suffered a concussion. However, again, there was no evidence to indicate that Bell suffered a concussion either before or after his discharge. Because there is no evidence to support the trial court's conclusion that Bell actually suffered a concussion and, by the trial court's own assessment, the laceration to the ear alone was insufficient to

sustain the State's burden of proof on the issue of great bodily harm, I believe the evidence was insufficient to support a finding of guilt on both the aggravated battery count and the official misconduct count that were predicated on great bodily harm. See, *e.g.*, *People v. Wallenberg*, 24 Ill. 2d 350, 354 (1962) (holding that the trial judge's statement on record that he had considered matters not in evidence necessarily rebuts the presumption that the judge considered only admissible evidence in reaching his conclusion).

¶ 111    In reaching its conclusion that the evidence was sufficient to support a finding of great bodily harm, the majority relies on the fact that Bell suffered from pain in his arm and his back from the blows. *Supra* ¶ 64. This would perhaps be sufficient to sustain a finding of simple battery, but aggravated battery requires something more. The majority further speculates that Bell may have suffered a concussion even though he was not treated for one. *Supra* ¶ 65. This is not relevant to the inquiry of what injuries Bell actually sustained. As previously noted, there is no evidence in the record that Bell ever suffered a concussion, whether or not he was actually treated for one. I would therefore reverse defendant's convictions on those counts predicated on great bodily harm.

¶ 112    Finally, I must note that I find the facts of this case and the treatment of those facts by both the majority and the trial court extremely troubling. The defendant deserved full and fair consideration on the issue of whether his actions were reasonable, not a visceral reaction to a videotape that would be expected of someone who only viewed the video on the evening news. In my view, he did not receive such consideration. Indeed, the trial court stated on record that it did not hear any evidence that defendant was trained to strike hard and fast with the baton until he achieved compliance, despite that fact that Danaher provided that very testimony and defendant corroborated it. Instead, the trial court, by its own admission, only heard the evidence, also provided by Danaher, that defendant should not have raised the baton over his head.

¶ 113    In its second paragraph, the majority characterizes Bell as nonaggressive and further states that "Bell was noncombative, nonaggressive, and nonhostile" (*supra* ¶ 51). This flies in the face of the plethora of evidence in the record that Bell was indeed aggressive, combative, belligerent and hostile. With the same myopic focus demonstrated by the trial court, the majority states that "[n]othing in the video indicates any physical actions by Bell that would necessitate" the use of the baton by defendant. *Id*. Even relying solely on the video, it is clear from Bell's body language that he was acting in an aggressive manner, removing his hands from behind his head and thrusting them forcefully in defendant's direction while apparently shouting at him, and even rising back up after defendant stopped using the baton and making an aggressive movement toward defendant. When considered in context with all of the other evidence, there can be no doubt that Bell was acting aggressively and combatively toward defendant during the incident.

¶ 114    The majority also glosses over the fact that Bell was not just intoxicated, he was so highly intoxicated that the hospital deemed him to be a security risk two hours after his admission, and more than six hours after he allegedly consumed his last alcoholic beverage. Three-and-a-half hours after his admission, Bell's chart indicated that he was intoxicated, belligerent and uncooperative. The majority further makes no mention of the fact that Bell, Stalbaum and Stacey were all plaintiffs in a civil lawsuit against the Village of Streamwood,

yet another factor to consider in determining the credibility of their testimony.

¶ 115    In its discussion of Bell's actions, the majority ignores the fact that both Bell and Stalbaum refused to obey a lawful command from a law enforcement officer and Stalbaum attempted to leave the scene. As our supreme court recently noted, "[p]ermitting [subjects] to flee from police *** would foster a lack of cooperation with law enforcement officers, putting the police and the public at risk." *People v. Henderson*, 2013 IL 114040, ¶ 50. Moreover, the court stated that "if the [subject] believed that the officer's conduct was illegal, he should have tested its legality through the courts, rather than engage in self-help by fleeing." (Internal quotation marks omitted.) *Id.* (quoting *Henson v. United States*, 55 A.3d 859, 869 (D.C. App. 2012)).

¶ 116    A determination of whether the force used by defendant in this case was reasonable is analogous to a determination of whether force used to effect a particular seizure is reasonable for fourth amendment purposes. In the context of fourth amendment seizures, the Supreme Court has noted that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments–in circumstances that are tense, uncertain and rapidly evolving–about the amount of force that is necessary in a particular situation." *Graham v. Conner*, 490 U.S. 386, 396-97 (1989). In conclusion, I do not believe either the trial court or the majority gave full and fair consideration to the issue of whether defendant's actions were reasonable under the circumstances of this case. For this reason, I would reverse defendant's convictions, vacate his sentence and remand for a new trial on only those counts that are predicated on use of a deadly weapon or simple battery.

¶ 117    Because I believe the testimony of Deputy Chief Keegan was erroneously admitted and constituted plain error, and because I believe the evidence was insufficient to support a finding of great bodily harm, I respectfully dissent.